RECORD NOS. 15-1318(L); 15-1384
[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

In The
# United States Court Of Appeals
# For The D.C. Circuit

## WILKES-BARRE HOSPITAL COMPANY, LLC,
## DOING BUSINESS AS WILKES-BARRE GENERAL HOSPITAL,

*Petitioner/Cross-Respondent,*

**v.**

## NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

-------------------------------------------------------------------------------------------

### PENNSYLVANIA ASSOCIATION OF STAFF NURSES AND ALLIED PROFESSIONALS,
*Intervenor.*

### ON APPEAL FROM
### THE NATIONAL LABOR RELATIONS BOARD

_____

### OPENING BRIEF OF
### PETITIONER/CROSS-RESPONDENT

_____

**Kaitlin Kaseta, Esq.**
CARMODY & CARMODY, LLP
**73 Bogard Street**
**Charleston, South Carolina  29403**
**(860) 307-3223**

**Bryan T. Carmody, Esq.**
CARMODY & CARMODY, LLP
**134 Evergreen Lane**
**Glastonbury, Connecticut  06033**
**(203) 249-9287**

*Counsel for Petitioner/*
  *Cross-Respondent*

*Counsel for Petitioner/*
  *Cross-Respondent*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The Undersigned, as Counsel for Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital (hereafter, at times, "Wilkes-Barre" or the "Hospital"), the Petitioner in the above-captioned case, whereby Wilkes-Barre has filed a Petition for Review of the Decision and Order officially reported by the Respondent, the National Labor Relations Board (hereafter, the "Board"), at Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital, 362 NLRB No. 148 (July 14, 2015), does hereby certify, in accordance with Local Rule 28(a)(1), as follows:

(A)     PARTIES AND *AMICI*:  As part of the proceedings below before the Board, the following parties appeared: (1) the Board's General Counsel, (2) Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital, and (3) the Pennsylvania Association of Staff Nurses and Allied Professionals (hereafter, the "Union").  No other party or intervenor or *amicus* appeared before the Board.

In the case now before the Court, there are currently two (2) parties, as follows:

Petitioner:

Wilkes-Barre Hospital Company, LLC d/b/a
Wilkes-Barre General Hospital
575 North River Street
Wilkes-Barre, PA 18764

Respondent:

National Labor Relations Board
Office of the General Counsel
Appellate Court Branch
Linda Dreeben, Esq.
1099 Fourteenth Street, N. W.
Washington, D. C. 20570

(B)    RULINGS UNDER REVIEW:  The rulings at issue as part of the case now before the Court are set forth by Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital, 362 NLRB No. 148 (July 14, 2015), whereby the Board concluded that the Hospital unlawfully refused to bargain with the Union on account of longevity wage increases that the Hospital did not pay to Registered Nurses represented by the Union.

(C)    RELATED CASES:      The Decision and Order now before the Court has not been before the Court, or any other Court, previously, and there are no related cases pending before any other Court.

Dated:      Glastonbury, CT
            October 13, 2015

Respectfully submitted,

/s/ BRYAN T. CARMODY, ESQ.
Bryan T. Carmody, Esq.
134 Evergreen Lane
Glastonbury, Connecticut 06033
(203) 249-9287
(860) 430-9437 (fax)
bryancarmody@bellsouth.net

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital, as the Petitioner in the above-captioned case, hereby makes the following disclosures:

1.    Wilkes-Barre Hospital Company, LLC is a privately-held limited liability company formed in Delaware that operates an acute healthcare institution in Wilkes-Barre, Pennsylvania.  The sole member of Wilkes-Barre Hospital Company, LLC is Wilkes-Barre Holdings, LLC, a privately-held holding company.

2.    No parent company as defined in Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit "controls" Wilkes-Barre Hospital Company, LLC.  Instead, Wilkes-Barre Hospital Company, LLC operates and does business as Wilkes-Barre General Hospital.  No publicly-traded company owns any direct interest in Wilkes-Barre Hospital Company, LLC. For the information of the Court, Community Health Systems, Inc., a publicly-traded holding company with no employees and a principal place of business in Franklin, Tennessee, is an indirect parent company of Wilkes-Barre Hospital Company, LLC. There are three separate entities in the ownership chain between Community Health Systems, Inc. and Wilkes-Barre Hospital Company, LLC.

Dated:      Glastonbury, CT
            October 13, 2015

Respectfully submitted,

/s/ BRYAN T. CARMODY, ESQ.
Bryan T. Carmody, Esq.
134 Evergreen Lane
Glastonbury, Connecticut 06033
(203) 249-9287
(860) 430-9437 (fax)
bryancarmody@bellsouth.net

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF CONTENTS.......................................................................v

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY.......................................................................xi

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES .................................................................2

STATUTES AND REGULATIONS....................................................4

STATEMENT OF THE CASE AND FACTS .........................................6

      1.)    Relevant Bargaining History.................................................6

      2.)    The 2011 CBA and Subsequent Negotiations.....................8

      3.)    Summary of Proceedings Before the Board.......................11

      4.)    The Decision of ALJ Flynn.................................................13

      5.)    The Decision of the Board .................................................14

SUMMARY OF THE ARGUMENT ...................................................16

STANDING ...................................................................................19

ARGUMENT ..................................................................................20

      1.)    The Standard of Review.....................................................20

2.)    The Board Erred by Finding the Regional Director had Authority to Issue and Prosecute the Consolidated Complaint ............................21

3.)    The Board's Findings Concerning the Status Quo and Unilateral Change are Not Supported by the Record...........................................25

        a.)    The Language of the 2011 CBA ...............................................26

        b.)    The Past Practice of the Parties...................................................31

4.)    The Board's Application of the "Clear and Unmistakable Waiver" Standard is Improper.............................................................35

5.)    The Board's Findings Regarding Waiver are Not Supported by the Record...........................................................................................37

6.)    The Board's Approach is Contrary to Precedent and Obfuscates the Long-Held Principles of the Act ..................................................40

        a.)    The Board's Decision Departs from Precedent .......................41

        b.)    The Board's Decision Contravenes the Purposes of the Act....................................................................................................44

CONCLUSION ........................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

<u>Alwin Mfg. Co., Inc.</u>,
    326 NLRB 646 (1988) ................................................................46

<u>Arizona v. United States</u>,
    575 F.2d 855 (U.S. Ct. Cl. 1978) .................................................26

<u>Ball Corp.</u>,
    322 NLRB 948 (1997) ..........................................................33, 34

<u>Chicago Tribune Co. v. NLRB</u>,
    974 F.2d 933 (7th Cir. 1992) ....................................................36

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>,
    401 U.S. 402 (1971) ............................................................. 20-21

<u>Cmty. Hospital of Cent. Cal.. N.L.R.B.</u>,
    335 F.3d 1079 (D.C. Cir. 2003) ...................................................37

[*]<u>DuPont de Nemours & Co. v. N.L.R.B.</u>,
    682 F.3d 65 (D.C. Cir. 2012) .......................................................31

[*]<u>Enloe Medical Center v. N.L.R.B.</u>,
    433 F.3d 834 (D.C. Cir. 2005) .....................................................36

<u>Finley Hospital</u>,
    359 NLRB No. 9 (2012), *vacated*,
    362 NLRB No. 102 (2015) ...............................................3, 15, 32, 39, 42, 48

[*]<u>H.K. Porter v. N.L.R.B.</u>,
    397 U.S. 99 (1970) ...............................................................44, 45

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

Hooks v. Kitsap Tenant Support Services, Inc.,
    No. 13-CV-5470, 2013 WL 4094344 (W.D. Wash Aug. 13, 2013) .............24

Hooks v. Remington Lodging & Hospitality, LLC,
    8 F. Supp. 3d 1178 (D. Alaska 2014) ............................................................24

*IBEW Local 47 v. N.L.R.B.,
    927 F.2d 635 (D.C. Cir. 1991)...........................................................20, 35, 36

Intermountain Rural Elec. Ass'n v. N.L.R.B.,
    984 F.2d 1562 (10th Cir. 1993) ......................................................... 38-39, 42

KiSKA Constr. Corp. v. Washington Metro. Area Transit Auth.,
    321 F.3d 1151 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 939 (2003).............26

Laborers Health and Welfare Trust Fund for Northern California v.
Advanced Lightweight Concrete Co., Inc.,
    484 U.S. 539 (1988).........................................................................................41

Laurel Baye Healthcare v. N.L.R.B.,
    564 F.3d 469 (D.C. Cir. 2009)........................................................................23

Litton Microwave Cooking Products Div., Litton Systems, Inc. v. N.L.R.B.,
    868 F.2d 854 (6th Cir. 1989) ..........................................................................38

Lyng v. Payne,
    476 U.S. 926 (1986)........................................................................................22

Mt. Clemons General Hospital,
    344 NLRB 450 (2005) ...................................................................................32

N.L.R.B. v. Katz,
    369 U.S. 736 (1962)........................................................................................41

N.L.R.B. v. Nello Pistoresi & Son, Inc.,
    500 F.2d 399 (9th Cir. 1974) .................................................................... 31-32

*N.L.R.B. v. Noel Canning,
    573 U.S. ___, 134 S. Ct. 2550 (2014) ........................................11, 21, 24, 25

N.L.R.B. v. Solutia, Inc.,
    699 F.3d 50 (1st Cir. 2012)................................................................36

*N.L.R.B. v. U.S. Postal Service,
    8 F.3d 832 (D.C. Cir. 1993)........................................................20, 35

*Neighborhood TV Co. v. Federal Communications Comm'n,
    742 F.2d 629 (D.C. Cir. 1984)..........................................................21

New Process Steel v. N.L.R.B.,
    560 U.S. 674 (2010)...........................................................................25

*Phelps Dodge Mining Co. v. N.L.R.B.,
    22 F.3d 1493 (10th Cir. 1994) ..........................................................31

Pirlott v. N.L.R.B.,
    522 F.3d 423 (D.C. Cir. 2008)..........................................................20

Railroad Yardmasters of America v. Harris,
    721 F.2d 1332 (D.C. Cir. 1983).........................................................20

Southwest General, Inc. d/b/a Southwest Ambulance v. N.L.R.B.,
    796 F.3d 67 (D.C. Cir. 2015)............................................................24

SSC Mystic Operating Co., LLC v. N.L.R.B.,
    801 F.3d 302 (D.C. Cir. 2015)..........................................................22

The Courier Journal,
    342 NLRB 1148 (2004).....................................................................38

The Post Tribune Co.,
    337 NLRB at 1280.............................................................................38

Transohio Sav. Bank v. Dir., Office of Thrift Supervision,
    967 F.2d 598 (D.C. Cir. 1992)..........................................................22

U.C. Health v. N.LR.B.,
    803 F.3d 669 (D.C. Cir. 2015)..........................................................22

Univ. of D.C. Faculty Ass'n. / NEA v.
D.C. Fin. Responsibility & Mgmt. Assistance Auth.,
        163 F.3d 616 (D.C. Cir. 1998)...................................................................22

Wayneview Care Center v. NLRB,
        664 F.3d 341 (D.C. Cir. 2011).................................................................20

Wilkes-Barre Hospital Company, LLC
d/b/a Wilkes-Barre General Hospital,
        362 NLRB No. 148 (July 14, 2015) ................................... i, ii, 2, 3

**Statutes:**

*5 U.S.C. § 706(2)(c) ...............................................................................23

29 U.S.C. §§ 151, *et seq.*..........................................................................1

29 U.S.C. § 153(b) ..........................................................................21, 22, 23

*29 U.S.C. § 153(d)...................................................................4, 21, 23

*29 U.S.C. § 154(a) ...........................................................................4, 23

29 U.S.C. § 158(a)(1).....................................................11, 12, 14, 16, 19

29 U.S.C. § 158(a)(5)..............................................7, 11, 12, 14, 16, 19

*29 U.S.C. § 158(d)...............................................................5, 17, 44

29 U.S.C. § 160(e) ................................................................................1

29 U.S.C. § 160(f) ................................................................................1

**Other Authorities:**

Black's Law Dictionary
        1264 (5th ed. 1979)..........................................................................43

National Labor Relations Board News Release,
"Statement by Chairman Pearce on Recess Appointment Rulings",
January 25, 2013 .........................................................................................24

# **GLOSSARY**

There are no terms contained herein which necessitate identification in a glossary.

## <u>JURISDICTIONAL STATEMENT</u>

Under Section § 10(e) of the National Labor Relations Act, as amended, (hereafter, the "Act"), 29 U.S.C. §§ 151, *et seq.*, the National Labor Relations Board possessed the subject matter jurisdiction to issue the Decision and Order dated July 14, 2015, which is a final order and the subject of the Petition for Review and Cross-Application for Enforcement now before the Court.

The Court has appellate jurisdiction pursuant to § 10(e) of the Act, and the venue in this Court is proper pursuant to § 10(f) of the Act. <u>See</u> 29 U.S.C. § 160(e); 29 U.S.C. § 160(f).

## STATEMENT OF ISSUES

Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital (hereafter, "Wilkes-Barre" or the "Hospital"), as the Petitioner in the above-captioned case, whereby Wilkes-Barre has filed a Petition for Review of the Decision and Order (hereafter, the "Decision") issued by the Respondent, the National Labor Relations Board (hereafter, the "Board"), officially reported at Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital, 362 NLRB No. 148 (July 14, 2015), hereby states, by the Hospital's Undersigned Counsel, that the issues raised by the Hospital's Petition for Review include:

(1)     Whether the Board erred by affirming the Administrative Law Judge's denial of Wilkes-Barre's Motion to Dismiss the Complaint on the grounds that the Regional Director who issued the Complaint, Mr. Dennis Walsh, lacked the authority to issue the Complaint,

(2)     Whether the Board erred by concluding that, although the collective bargaining agreement between Wilkes-Barre and the labor organization (hereafter, the "Union") that represented the Hospital's Registered Nurses (hereafter, the "RNs") did not obligate the Hospital to pay the RNs longevity increases after the expiration of the agreement, the Hospital, nonetheless, was under a statutory obligation to do so,

2

(3)     Whether the Board erred by concluding that the Union did not waive any statutory right for continued payments of longevity increases after, and in spite of, the expiration of the collective bargaining agreement,

(4)     Whether the Board erred by finding that, in order to maintain the status quo, Wilkes-Barre was obligated to continue the payment of longevity increases after, and in spite of, the expiration of the parties' collective bargaining agreement,

(5)     Whether the Board erred by rejecting Wilkes-Barre's argument that, as part of a past practice between the Hospital and the Union, the Hospital did not pay longevity increases after the expiration of a collective bargaining agreement,

(6)     Whether the Board erred by ignoring the fact that the agency's General Counsel previously dismissed a claim that the Hospital engaged in the very same unfair labor practice by virtue of the Hospital's failure to pay the RNs longevity increases after the expiration of a previous collective bargaining agreement, and

(7)     Whether Members Hirozawa and McFerran erred by relying upon Finley Hospital, 362 NLRB No. 102 (2015), to conclude that the Hospital engaged in an unfair labor practice.

## STATUTES AND REGULATIONS

**5 U.S.C. § 706(2)(C)**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**29 U.S.C. § 153(d)**

(d) General Counsel; appointment and tenure; powers and duties; vacancy

There shall be a General Counsel of the Board who shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years. The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than administrative law judges and legal assistants to Board members) and over the officers and employees in the regional offices. He shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law. In case of a vacancy in the office of the General Counsel the President is authorized to designate the officer or employee who shall act as General Counsel during such vacancy, but no person or persons so designated shall so act (1) for more than forty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted.

**29 U.S.C. § 154(a)**

(a) Each member of the Board and the General Counsel of the Board shall be eligible for reappointment, and shall not engage in any other business, vocation, or employment. The Board shall appoint an executive secretary, and such attorneys, examiners, and regional directors, and such other employees as it may from time to time find

necessary for the proper performance of its duties. The Board may not employ any attorneys for the purpose of reviewing transcripts of hearings or preparing drafts of opinions except that any attorney employed for assignment as a legal assistant to any Board member may for such Board member review such transcripts and prepare such drafts. No administrative law judge's report shall be reviewed, either before or after its publication, by any person other than a member of the Board or his legal assistant, and no administrative law judge shall advise or consult with the Board with respect to exceptions taken to his findings, rulings, or recommendations. The Board may establish or utilize such regional, local, or other agencies, and utilize such voluntary and uncompensated services, as may from time to time be needed. Attorneys appointed under this section may, at the direction of the Board, appear for and represent the Board in any case in court. Nothing in this subchapter shall be construed to authorize the Board to appoint individuals for the purpose of conciliation or mediation, or for economic analysis.

## 29 U.S.C. § 158(d)

(d) Obligation to bargain collectively For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession:
Provided,

That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

## STATEMENT OF THE CASE AND FACTS

Wilkes-Barre Hospital Company, LLC d/b/a Wilkes-Barre General Hospital (hereafter, "Wilkes-Barre" or the "Hospital") operates an acute care facility in Wilkes-Barre, Pennsylvania. (GC Ex. 1, JA 143) The Hospital's full-time and part-time graduate and registered nurses are represented for purposes of collective bargaining by the Pennsylvania Association of Staff Nurses and Allied Professionals, AFL-CIO (hereafter, the "Union"). (GC Ex. 1, JA 143)

### 1.)     Relevant Bargaining History

Prior to May 12, 2009, the Hospital was owned by Wyoming Valley Healthcare System (R. Ex. 8, JA 387) Wyoming Valley Healthcare System and the Union entered into a collective bargaining agreement whose term was October 9, 2005 through January 26, 2011 (hereafter, the "2005 CBA"). (Tr. 266, JA 125) Article 25 of the 2005 CBA provided that covered employees would receive annual wage increases upon ratification in October 2005, and in January of each succeeding year of the agreement, calculated on the combined basis of applicable seniority-based minimum wage scales and an annual percentage increase, which varied with each year of the contract term. (Tr. 269, JA 127)

Upon the change in ownership of the Hospital in 2009, the new corporate owner of the Hospital did not assume the 2005 CBA in its entirety. (Tr. 268, JA 126) Rather, the Hospital and the Union negotiated a Memorandum of Agreement,

effective May 1, 2009 through July 1, 2009, which, by its terms, constituted the parties' collective bargaining agreement (hereafter, the "2009 CBA"). (R. Ex. 8, JA 387) The 2009 CBA incorporated by reference certain terms of the 2005 CBA, including the nurses' then current rates of pay, as well as Article 25 of the 2005 CBA, entitled "Wage Minimums and Increases" (hereafter, the "Wage Article"). (R. Ex. 8, JA 388) Thus, during the term of the 2009 CBA, covered employees continued to receive annual wage increases in the same manner that they had under the 2005 CBA. (R. Ex. 8, JA 388)

Upon the expiration of the 2009 CBA on July 1, 2009, the parties commenced negotiations and reached a successor collective bargaining agreement on April 30, 2011. (Tr. 268, JA 126) Accordingly, the parties were without a collective bargaining agreement from July 1, 2009 until April 30, 2011. A wage increase was paid to the Hospital's nurses in January 2009 by Wyoming Valley Healthcare System, but no wage increases of any kind were paid to the nurses in January of 2010 or January of 2011. (Tr. 268, 270, JA 126, 128) In 2010, the Union filed unfair labor practice charges with Region Four of the National Labor Relations Board (hereafter, the "Board"), alleging that the Hospital's failure to pay wage increases in January 2010 violated Section 8(a)(5) of the Act. (Tr. 270, JA 128) Region Four dismissed the charges filed by the Union, and General Counsel's Office of Appeals upheld the Region's dismissal on appeal. (Tr. 270,

Employer's Post-Hearing Brief FN1, JA 128, 425)  In 2011, the Union did not file any unfair labor practice charge in connection with the Hospital's nonpayment of wage increases in January 2011, nor did the Union demand to bargain with the Hospital over the Hospital's nonpayment of wage increases in January 2011.  (Tr. 270, Employer's Post-Hearing Brief FN1, JA 128, 425)

## 2.)     The 2011 CBA and Subsequent Negotiations

The parties' collective bargaining negotiations from 2009 to 2011 ultimately resulted in the parties reaching a collective bargaining agreement with an effective term of April 30, 2011 to April 30, 2013 (the "2011 CBA"). (GC Ex. 2, JA 223)  In all material aspects, the Wage Article of the 2011 CBA was identical in structure and content to the Wage Article of the 2009 CBA and thus also, the 2005 CBA.  See R. Ex. 7, R. Ex. 8 and GC Ex. 2; JA 380, 388, 269.  The 2011 CBA provided that increases in pay be provided to the nurses in May 2011, January 2012, and January 2013.  (GC Ex. 2, JA 269-270)  "Appendix A" to the Wage Article established minimum base hourly rates for Registered Nurses at various seniority levels[1], which formed the basis for calculating the annual wage increases specified for May 2011, January 2012, and January 2013.  (GC Ex. 2, JA 269-270)  Appendix A to the 2011 CBA then set forth the particular amount of the increase paid to a nurse at each level of seniority for each year of the contract, based upon his or her seniority level:

[1] Seniority levels were grouped as follows: 0-2 years; 3-4 years; 5-9 years; 10-14 years; 15-19 years; 20-24 years; and 25+ years.

8

|         | Acute Care | | | | Health Services | | |
|---------|--------------|----------------|----------------|--|--------------|----------------|----------------|
|         | May, 2011 | January 2012 | January 2013 | | May, 2011 | January 2012 | January 2013 |
| 0-2     | $24.90 | $25.58 | $26.10 | | $19.54 | $20.08 | $20.48 |
| 3-4     | $25.76 | $26.47 | $27.00 | | $20.10 | $20.65 | $21.07 |
| 5-9     | $26.55 | $27.28 | $27.83 | | $21.04 | $21.62 | $22.05 |
| 10-14   | $27.87 | $28.64 | $29.21 | | $22.14 | $22.75 | $23.20 |
| 15-19   | $28.74 | $29.53 | $30.12 | | $22.68 | $23.30 | $23.77 |
| 20-24   | $29.17 | $29.97 | $30.57 | | $23.20 | $23.84 | $24.31 |
| 25+     | $30.11 | $30.94 | $31.56 | | $23.84 | $24.50 | $24.99 |

The relevant provisions of the Wage Article of the 2011 CBA state as follows:

**Section 1** – Effective upon the first full payroll period following the date of ratification, regular full-time and regular part-time registered nurses who have completed their probationary period shall be paid no less than the minimum hourly base rates set forth on Appendix A, specifically May 2011. Consequently, those who are paid less than the minimum base hourly rates set forth in Appendix A, specifically May 2011 shall be raised to those rates. Those who are already receiving higher base hourly rates than those specified in Appendix A shall retain those higher rates, but shall receive an increase only in accordance with Section 2 below.

**Section 2** – Effective the first full pay period after January 27, 2012, minimum base hourly rates shall be paid as set forth in Appendix A, specifically January 2012. Those who are paid less than the minimum for their service level shall be raised to the new minimum base hourly rate. Those whose base hourly rates already equal or exceed the minimum rates in Appendix A; specifically January 2012 shall receive a 2.75% increase in their then-existing base hourly rate if the most recent annual performance evaluation indicates the individual meets standards. Where an employee's increase to the wage scale is less than the percentage increase of his/her then existing base hourly rate

9

specified above, he/she shall be entitled to the percentage increase specified above if the most recent performance evaluation indicates the individual meets standards.

**Section 3** – Effective the first full pay period after January 27, 2013, minimum base hourly rates shall be paid as set forth in Appendix A, specifically January 2013. Those who are paid less than the minimum for their service level shall be raised to the new minimum base hourly rate. Those whose base hourly rates already equal or exceed the minimum rates in Appendix A; specifically January 2013 shall receive a 2.00% increase in their then-existing base hourly rate if the most recent annual performance evaluation indicates the individual meets standards. Where an employee's increase to the wage scale is less than the percentage increase of his/her then-existing base hourly rate specified above, he/she shall be entitled to the percentage increase specified above if the most recent annual performance evaluation indicates the individual meets standards.

**Section 4** – Wage minimums shall be based upon the employee's length of continuous service as a registered nurse in any registered nurse position within Wyoming Valley Healthcare System or its predecessors. Those who have been granted credit for prior registered nurse service at other institutions shall retain such length of service for wage determination purposes only. New hires may be given credit for prior registered nurse experience.

**Section 5** – For the purposes of computing compensation under this Article, the "base hourly rates" of salaried employees shall be their base bi-weekly salary divided by (80) eighty hours. Unless the effective date of an increase falls on the first day of the payroll period the increase shall actually become payable on the first day of the next payroll period. Scale increases according to longevity shall become due only upon January 27th of the year following the employee's anniversary date.

The 2011 CBA expired by its terms on April 30, 2013. The parties initiated negotiations for a successor agreement on February 15, 2013. (Tr. 64, JA 100) Following the expiration of the 2011 CBA, the Hospital did not pay any increases

to Registered Nurses in January 2014.  (Tr. 272, JA 129)  During the negotiations succeeding the 2011 CBA, the Hospital made proposals in bargaining to change the structure of the Wage Article, including changes to the way the nurses' wage increase would be paid in January of 2014.  (GC Ex. 12, JA 315-317)

### 3.)     Summary of Proceedings Before the Board

The Union filed an unfair labor practice charge with Region Four of the Board, alleging that the Hospital's nonpayment of wage increases in January 2014, after the 2011 CBA expired, was a violation of Section 8(a)(5) and (1) of the National Labor Relations Act (hereafter, the "Act"). (GC Ex. 1, JA 181)  On April 23, 2014, the Regional Director for Region Four of the Board issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Board Case Nos. 04-CA-111130, 04-CA-121027, and 04-CA-123748 (collectively, the "Consolidated Complaint"), which included the Union's allegations relating to the Hospital's nonpayment of longevity-based wage increases in January 2014.  (GC Ex. 1, JA 154)  The Hospital filed a timely Answer to the Consolidated Complaint on May 7, 2014, and its First Amended Answer to the Consolidated Complaint on July 13, 2014.  (R. Ex. 2, JA 359, 368)

On July 8, 2014, the Hospital filed a Motion to Dismiss the Consolidated Complaint on the ground that, as a result of the United States Supreme Court's ruling in N.L.R.B. v. Noel Canning, 573 U.S. ___ (2014), the Board was without

quorum, and therefore without authority to act, at the time that the Board appointed the Regional Director for Region Four. Therefore, the Hospital argued, the Complaint and Notice of Hearing issued by the Regional Director were void *ab initio*. (Motions to Dismiss & Adjourn, JA 67, 74)  On the same date, the Hospital also filed a Motion to Adjourn the Hearing Pending the Decision on the Hospital's Motion to Dismiss the Consolidated Complaint.  (R. Ex. 7, JA 380)  Both of the Hospital's Motions were denied by the Board on July 10, 2014. [2] (Letter, JA 84)

On July 14-16, 2014 a three-day Hearing was held on the Consolidated Complaint before Administrative Law Judge Susan Flynn (hereafter, "ALJ Flynn").  On September 16, 2014, the Union filed a request to withdraw all unfair labor practice charges contained in the Consolidated Complaint, with the exception of those allegations set forth in Paragraph 8 of the Consolidated Complaint concerning the Hospital's nonpayment of increases to bargaining unit members on January 27, 2014. (Letter, JA 414)  The Union's request was approved by the Regional Director for Region Four of the Board on September 23, 2014.  (Letter, JA 420)  Thus, the only remaining issue before ALJ Flynn for determination was whether the Hospital violated Sections 8(a)(5) and (1) of the Act when it did not

---

[2] By letter dated July 14, 2014, the Associate Executive Secretary of the Board advised counsel for the Hospital that he could not forward the Hospital's Motion to Dismiss the Consolidated Complaint to the Board because it was untimely, but noted that the issue raised by the Motion to Dismiss the Consolidated Complaint could be raised in any Exceptions to the Administrative Law Judge's decision that might be filed with the Board. (Letter, JA 91)

pay longevity-based increases to bargaining unit members on or about January 27, 2014.

### 4.)     The Decision of ALJ Flynn

On November 17, 2014, ALJ Flynn issued her Decision in the case. (Decision, JA 448)  ALJ Flynn found that the Regional Director had authority to issue and prosecute the Complaint.  (Id., JA 451-453)  ALJ Flynn relied upon a delegation of the Board's appointment authority, made by the Board to the Board's General Counsel, to hold that the Regional Director's appointment was valid.  (Id., JA 451)  ALJ Flynn also relied upon the Board's later ratification of the Regional Director's appointment, once the Board had regained the necessary quorum to act, as further evidence that the Regional Director held his position lawfully.  (Id., JA 452)

On the merits, ALJ Flynn found that the Hospital did not have any contractual obligation to pay any increases to covered employees.  (Id., JA 453)  ALJ Flynn did find, however, that the Hospital's statutory obligation to maintain the status quo following contract expiration required the Hospital to pay longevity-based increases in January 2014 to those employees who, during calendar year 2013, had reached the next level of seniority category set forth by the first column of Appendix A of the expired 2011 CBA, absent bargaining to impasse with the Union over the issue.  (Id., JA 456)  Finding that bargaining to impasse had not

13

occurred, ALJ Flynn found that the Hospital had violated Sections 8(a)(5) and (1) of the Act when it did not pay longevity-based increases to bargaining unit members on or about January 27, 2014.  (Id., JA 457)

The remedy ordered by ALJ Flynn in connection with her Decision required that the Hospital notify and bargain with the Union prior to implementation of any changes in wages, hours, or other terms and conditions of employment.  (Id., JA 458)  The remedy also required the Hospital to pay increases to covered employees whose hourly wage rates, based on level of seniority, were less than the minimum rates for their described in the right-most column, labeled January 27, 2013, of Appendix A to the 2011 CBA.  (Id., JA 458)  Finally, ALJ Flynn ordered a "make whole remedy" for any employees who sustained losses as a result of the fact that the ordered longevity-based increases were not paid in January 2014.  (Id., JA 458)

### 5.)     The Decision of the Board

In response to ALJ Flynn's Decision, the Hospital filed timely Exceptions with the Board on December 22, 2014.  (Exceptions, JA 463)  On July 14, 2015, the Board issued the Decision and Order (hereafter, the "Decision") now before the Court.  (Decision, JA 573)  In the Decision, the Board affirmed ALJ Flynn's rulings, findings and conclusions, both with regard to the Regional Director's authority to issue the Consolidated Complaint, and the Hospital's violation of Sections 8(a)(5) and (1) of the Act by its nonpayment to pay wage increases in

January 2014. [3] (Decision, JA 573) However, in affirming the ALJ on the alleged

violation of the Act, the Board held that they did not rely upon the ALJ's statement

that the two Wage Articles from the 2009 CBA and 2011 CBA were different, and

therefore not comparable, when reaching their Decision.  (Decision, JA 573)

---

[3] Though Members Hirozawa and McFerran held that Finley Hospital supported the ALJ's Decision, Member Johnson concurred in the Board's Decision only on the basis of the specific facts of the case.  Member Johnson held that the status quo in the case required continued payment of longevity-based increases, and that the "wage freeze" rendered by the Hospital's nonpayment of such increases was a unilateral change to employees' terms and conditions of employment.  (Board Decision, FN2, JA 573).

## SUMMARY OF THE ARGUMENT

The case now before this Court centers around two basic concepts that have undergone significant distortion by way of the Board's interpretation, namely: (1) What constitutes the status quo after contract expiration; and (2) What constitutes waiver of a statutory right to continuation of a term and condition of employment? Despite the seeming simplicity of both the facts and questions of law in this case, the Board has managed to create a legal quagmire out of this case, by its continued misapplication of its own precedent, and its disregard for both the facts contained in the underlying record and the boundaries of its own statutory authority.

As a threshold matter, the Board should have dismissed the Complaint upon the Hospital's Motion to Dismiss, upon the basis that the Regional Director of Region Four was appointed by the Board during a period of time during which the Board lacked the necessary quorum to act in such a manner. Rather than acknowledge the issue and face the need for the Board to carry out its statutory duties legally, the Board has ignored the statutory limitations on its authority to act and attempted to shrug off the problem with an assortment of *post hoc* rationales that prove to be equally untrue and unconvincing.

On the merits of the alleged violations of 8(a)(1) and (5) of the Act, the Board's Decision is a troubling example of the Board's failure to carry out its statutory obligations, at the cost of justice and fair adjudication. First, the Board

16

ignored virtually all of the evidence in the underlying record by finding a unilateral change in the terms and conditions of employment by way of the Hospital's nonpayment of wage increases in January 2014. In the process, the Board's Decision ignores the clear language of the 2011 CBA and the shared understanding of that language between the parties, demonstrated by their consistent past practices concerning wage increases during times where no collective bargaining agreement was in effect. Next, the Board applied its "clear and unmistakable waiver" standard to its analysis of the Union's waiver of its statutory right to longevity-based increases, despite having been admonished multiple times by this Court and that the standard was inappropriate and was being routinely misapplied by the Board. Finally, the Board's analysis of waiver under the clear and unmistakable waiver standard once again ignored essential evidence from the underlying record and therefore, should not be upheld by this Court.

Perhaps the most disturbing facet of this case, however, is that it signals, once and for all, the clearly unlawful departure by the Board from its own precedent on the subject of the statutory obligation to maintain the status quo, and the Board's unlawful foray into the substance of collective bargaining between private parties. The Board's attempts to control, rather than oversee, collective bargaining between private parties, by imposing specific contract terms upon them, are in direct contravention of Section 8(d) of the Act, and longstanding United

17

States Supreme Court precedent.  While the case now before the Court is not the first where the Board has unlawfully attempted to expand its authority and reach into the substance of bargaining between the parties, the deleterious effect of the Board's actions, which upset the delicate balance the Act strikes between governmental oversight and the contract and bargaining rights of private parties, illustrate that it must be the last.

## **STANDING**

There is no dispute that the Hospital has standing to file the Petition for Review, insofar as the Decision finds the Hospital committed violations of Sections 8(a)(1) and (5) of the Act and directs the Hospital to take remedial action.

**ARGUMENT**

**1.)    The Standard of Review**

Where a "challenge presents a question of power or jurisdiction," the Court's review is plenary and *de novo*.  Railroad Yardmasters of America v. Harris, 721 F.2d 1332, 1338 (D.C. Cir. 1983).  Similarly, when interpreting the terms of a collective bargaining agreement, the Court accords no deference to the Board's interpretation of the collective bargaining agreement, but rather will consider contract language, past practice, relevant bargaining history, and the parties' relationship when interpreting contract terms *de novo*.  N.L.R.B. v. U.S. Postal Service, 8 F.3d 832, 837 (D.C. Cir. 1993); IBEW Local 47 v. N.L.R.B., 927 F.2d 635, 640-641 (D.C. Cir. 1991).

In reviewing the Board's finding of a violation of the Act, the Court's role is to evaluate whether, based upon the record as a whole, the Board's findings are supported by substantial evidence.  Wayneview Care Center v. NLRB, 664 F.3d 341, 348 (D.C. Cir. 2011).  Equally so, the Court must consider whether the Board's actions were arbitrary, or whether the Board erred in its application of established law to the facts of the case.  Pirlott v. N.L.R.B., 522 F.3d 423, 432 (D.C. Cir. 2008).  Where an agency's actions exceed the scope of its authority pursuant to the Act or are otherwise not in accordance with the law, the Court must vacate the agency's decision.  Citizens to Preserve Overton Park, Inc. v. Volpe,

20

401 U.S. 402, 416 (1971).   In reviewing the Board's determinations, the Court must not "merely rubber-stamp an agency decisions.   [Rather, the Court must] ensure that the agency took a 'hard look' at all relevant issues and considered all reasonable alternatives to its decided course of action."  Neighborhood TV Co. v. Federal Communications Comm'n, 742 F.2d 629, 639 (D.C. Cir. 1984).

### 2.)     The Board Erred by Finding the Regional Director had Authority to Issue and Prosecute the Consolidated Complaint

The Board's refusal to relinquish power during a period of time where the United States Supreme Court found that the Board was without valid authority to act constitutes the Board's first reversible error in this case.  In N.L.R.B. v. Noel Canning, 134 S. Ct. 2550 (2014), the United States Supreme Court ruled that the Board lacked a valid quorum, as required by Section 3(b) of the Act, from January 3, 2012 through August 5, 2013.  During this period of time, on January 29, 2013, the Board appointed Dennis P. Walsh to serve as the Regional Director of Region Four.  After the Supreme Court issued its decision in Noel Canning, the Hospital promptly filed a Motion to Dismiss the Complaint, on the grounds that, at all times since his invalid appointment, Regional Director Walsh has been without authority to act, and therefore, was without authority to act when he issued the Order Consolidating Cases, the Consolidated Complaint, and the Notice of Hearing in this case.  The Board affirmed ALJ Flynn's findings that the Board had properly delegated authority to the General Counsel to appoint Regional Directors for the

period of time that the Board was found to have been without quorum, and furthermore, that the Board had insulated itself from liability by retroactively ratifying the appointment of Regional Director Walsh on July 18, 2014, after the Board had regained quorum.

The Board's argument ignores the improper motives espoused by the Board's attempts to dodge a loss of power and authority, which are ultimately the reason for which this Court should invalidate the Regional Director's actions. [4] An agency's power can be no greater than that delegated to it by Congress. Lyng v. Payne, 476 U.S. 926, 937 (1986). Agency actions beyond delegated authority must be invalidated. Transohio Sav. Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 621 (D.C. Cir. 1992). Courts will look to an agency's enabling statute to determine whether Congress intended the agency to have the power that it exercised when it acted. Univ. of D.C. Faculty Ass'n. / NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 163 F.3d 616, 620-21 (D.C. Cir. 1998). The Administrative Procedure Act requires that agency actions found to be in

---

[4] The Hospital acknowledges this Court's decisions in SSC Mystic Operating Co., LLC v. N.L.R.B., 801 F.3d 302 (D.C. Cir. 2015) and U.C. Health v. N.LR.B., 803 F.3d 669 (D.C. Cir. 2015), but urges that the contextual distinction – delegation of authority to oversee elections to Regional Directors pursuant to Section 3(b) of the Act, versus delegation of authority to appoint Regional Directors to the General Counsel under Section 3(d) of the Act, should result in a different outcome in the case at bar. Though actions taken by the Regional Directors under both delegations are admittedly subject to Board review, this fact does not absolve the Board of an improper delegation of its power to appoint Regional Directors to the General Counsel pursuant to Section 3(d) of the Act in the initial inquiry.

excess of statutory jurisdiction, authority, or limitations must be set aside by the Court.  5 U.S.C. § 706(2)(c).  Upon these grounds, the employer in <u>Laurel Baye Healthcare v. N.L.R.B.</u> argued that the Board's attempt to dodge an anticipated loss of quorum rendered the Board's delegation in that case void in and of itself.  564 F.3d 469 (D.C. Cir. 2009).  This Court's decision in <u>Laurel Baye Healthcare</u> focused on the unlawful two-Member group in that case, but the Court did not reject out of hand the employer's argument concerning the impropriety of the Board's attempted delegation – the Court simply did not reach that question.  <u>Id.</u>

In the case at bar, the Board's delegation of appointment authority to the General Counsel was *ultra vires*.  Section 3(d) of the Act, which governs the powers of the Board's General Counsel, includes no indication that Congress intended to allow the Board to delegate the authority to appoint Regional Directors to the General Counsel.  29 U.S.C. § 153(d).  This omission is particularly glaring when contrasted with the clear delegation language of Section 3(b) of the Act.  <u>See</u>, 29 U.S.C. § 153(b).  Furthermore, the Board's argument that it is absolved of wrongdoing by way of its delegation of power to appoint Regional Directors to the General Counsel ignores the fact that the Board itself has continued to recognize that the appointment and/or transfer of Regional Directors by the General Counsel shall be made only with the approval of the Board.  <u>See</u> 29 U.S.C. § 154(a); <u>See Also</u>, R.Ex. 2, JA 369.

However, even if the Board's delegation was lawful on its face, the unlawful purpose for which the Board made the delegation – namely, to nullify the effect of the Board's loss of quorum and lack of authority to act – rendered the application of the Board's delegation unlawful.  Tellingly, until the Supreme Court released its Decision in <u>Noel Canning</u>, the Board had taken the position that it, not the General Counsel, had made the appointments during the no-quorum period, and that those appointments remained lawful.  <u>See</u>, *e.g.,* <u>National Labor Relations Board News Release</u>, "Statement by Chairman Pearce on Recess Appointment Rulings", January 25, 2013.  Only after the Supreme Court decided <u>Noel Canning</u> did the Board take the position that the General Counsel, rather than the Board, had been responsible for the no-quorum appointments. [5]  Thus, the battle over the legality of the delegation is ultimately ancillary, as the Board routinely took credit for the appointment of Regional Director Walsh.  That fact, proving on its own the improper motives espoused by the Board when it began relying upon the delegation to the General Counsel, is sufficient to illustrate the Board's improper purpose and render Regional Director Walsh's appointment null and void pursuant to the clear language of the Administrative Procedure Act.

_____

[5] It is additionally worth noting that the General Counsel's authority to issue Complaints during the same time period was equally dubious.  <u>See</u>, *e.g.,* <u>Southwest General, Inc. d/b/a Southwest Ambulance v. N.L.R.B.</u>, 796 F.3d 67 (D.C. Cir. 2015); <u>Hooks v. Remington Lodging & Hospitality, LLC</u>, 8 F. Supp. 3d 1178 (D. Alaska 2014); <u>Hooks v. Kitsap Tenant Support Services, Inc.</u>, No. 13-CV-5470, 2013 WL 4094344 (W.D. Wash Aug. 13, 2013).

Similarly, the Board's argument that the Board later confirmed, adopted and ratified the appointments made during the no-quorum period once the Board had regained the necessary quorum to act does not insulate the Board from the invalidity of the original appointments and the actions taken thereunder. The Board's *post hoc* ratification was yet another attempt to achieve an improper end, imbuing the Agency with statutory authority when it had none, in direct contravention of the Supreme Court's rulings in <u>Noel Canning</u> and <u>New Process Steel v. N.L.R.B.</u>, 560 U.S. 674 (2010). This type of over-reaching for authority by the Board is precisely the type of action that the Supreme Court struck down in <u>Noel Canning</u>. For all the foregoing reasons, the Court should find that the Regional Director was without authority to issue and prosecute the Complaint, and should set aside the Complaint as unlawfully issued and prosecuted.

### 3.)    The Board's Findings Concerning the Status Quo and Unilateral Change are Not Supported by the Record

The Board's finding of a unilateral change, and related findings concerning the status quo, in the case at bar are not supported by substantial evidence, based upon review of the underlying record as a whole. First, the Board's tortured reading of the relevant sections of the 2011 CBA as evidence of an ongoing obligation to pay longevity-based wage increases after the 2011 CBA expired flouts the record evidence. Second, the Board's finding of a unilateral change completely ignores the record evidence of the parties' past practice concerning

longevity-based wage increases post-contract expiration, which supports the Hospital's assertion that no unilateral change occurred; and that rather, both parties were aware of, and acquiesced to, the post-expiration cessation of wage increases.

### a.) The Language of the 2011 CBA

Rather than support the Board's finding that the Hospital had a statutory obligation to pay longevity-based increases after the expiration of the 2011 CBA, the underlying record as whole thoroughly contradicts the Board's finding. Contracts must be read as a whole, with meaning given to every provision. KiSKA Constr. Corp. v. Washington Metro. Area Transit Auth., 321 F.3d 1151, 1163 (D.C. Cir. 2003), *cert. denied,* 540 U.S. 939 (2003). Courts have previously recognized:

> "Provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." Arizona v. United States, 575 F.2d 855, 863 (U.S. Ct. Cl. 1978).

Read as an integrated contract provision, the clear language of the Wage Article of the 2011 CBA, and the consistent past practice of the parties illustrate that cessation of wage increases during periods of contract expiration was indeed the status quo between the two parties, and thus, that the Hospital had not made any unilateral change to the terms and conditions of employment. Longevity-

based increases were only paid to employees in conjunction with the across-the-board increases paid to employees pursuant to the 2011 CBA – never were the "two types" of increases included in Appendix A to the Wage Article ever paid as two separate increases.  Rather, pursuant to the clear language of the 2011 CBA, employees were paid one increase on each of three, specified dates certain set forth by Appendix A: May 2011 (Section 1 of the Wage Article); the first full pay period after January 27, 2012 (Section 2 of the Wage Article); and the first full pay period after January 27, 2013 (Section 3 of the Wage Article).  The increase that each employee received on those three, specified dates was the product of the combination of the employees' seniority and the across-the-board increase amount, as specified by the Wage Article of the 2011 CBA.  Due to the interplay between the across-the-board increases and the longevity-based increases created by the language of the 2011 CBA, it is impossible to consider the amount due for one increase without considering the amount due for the other increase.  In fact, the past practice of the parties illustrates that the concept of paying one "type" of increase without the other was never contemplated by the parties – the employees only received one, integrated wage increase under the 2011 CBA.

Finally, the descriptive language accompanying Appendix A to the Wage Article of the 2011 CBA explicitly states, "During the term of this Agreement, the initial wage scale and subsequent applicable wage increases to same for bargaining

unit RN's shall be in accordance with the following [Appendix]," thereby removing any uncertainty as to whether the parties contemplated the continuation of any increases beyond the expiration date of the 2011 CBA. All of this evidence very clearly indicates that the longevity-based increases set forth by the Wage Article and Appendix A of the 2011 CBA were intended to operate, and did operate, exclusively in conjunction with and in the same manner as the across-the-board increases set forth by the Wage Article of the 2011 CBA. As such, the longevity-based increases were clearly set to expire with the 2011 CBA, and therefore the Hospital's cessation of payment of wage increases after the expiration of the 2011 CBA was not a deviation from the status quo that existed between the parties.

The Board's contortion of the language of the 2011 CBA to fit the Board's theory of unilateral change with regard to the longevity-based increases is a tortured attempt to fit a square peg into a round hole. The Board's theory that longevity-based wage increases did not expire with the 2011 CBA is based upon the Board's isolation of Sections 4 and 5 of the Wage Article of the 2011 CBA, which were never intended to be read in a vacuum as separate and independent provisions from the rest of the Wage Article. [6] Rather, both the plain language and

---

[6] The Board also bases its conclusion that longevity based increases must be continued even after contract expiration upon a reading of Appendix A that is stripped of context. The table in Appendix A was never intended to stand alone, and cannot be read alone without reference to the Wage Article to which it is appended.

28

the record clearly illustrate that Section 4 defines how "length of continuous service" is to be calculated in the context of the combination increases set forth by Sections 1-3 of the Wage Article. The fact that Section 4 does not repeat the increase scheme set forth by Sections 1-3 cannot reasonably be read by the Board to establish a basis for the continuation of increases post-expiration for an undefined, and apparently limitless, period of time, especially in light of the record evidence detailed above. Similarly, the Board cannot simply ignore that, pursuant to Section 5, longevity-based wage increases were to be paid on January 27th of the following year – the same date upon which increases are due pursuant to Sections 1-3 of the Wage Article. Rather, the substantial evidence in the record supports the conclusion that Section 5 and Sections 1-3 are all referencing the same three, defined wage increases set forth in Appendix A to the Wage Article.

The error of the Board's conclusion to the contrary is illustrated by the Board's calculation of the longevity-based increases that it deems certain covered employees are entitled to post-expiration. See, Board Decision, JA 573. Without reading the Wage Article as an integrated whole, it is impossible for the Board to award longevity-based increases that are calculated in the same manner as they were during the term of the 2011 CBA. Without the percentage increase scheme explained in Section 3 of the Wage Article, along with the definition of continuous service explained in Section 4 of the Wage Article, the longevity-based increase

29

the Board seeks to impose cannot be calculated in the same manner that increases were calculated during the term of the 2011 CBA.  Undeterred by this glaring anomaly, the Board created what amounts to a new contract provision that entirely ignores the scheme of the Wage Article and the past practice of the parties.  The result is a whole new type of exclusively-longevity-based increase, under which some nurses who achieve a new longevity step receive no increase, some nurses will receive a few additional cents, and some nurses will receive an increase of over 2%.  This haphazard increase scheme does not reflect any "status quo" supported by the language of the Wage Article of the 2011 CBA, or the past practice of the parties.  Instead, it represents an entirely new type of increase created independently by the Board and unlawfully imposed upon the parties.

In summary, in order to reach the result that the Board has reached with regard to the wage increases set forth by the 2011 CBA, one must ignore the established term of the 2011 CBA, ignore the absolute language of Sections 1-3 of the 2011 CBA, ignore the dates included on the columns of Appendix A, ignore the "Duration" clause of the 2011 CBA, and ignore the past practice of the parties with regard to the paying of wage increases.  Instead of reading the Wage Article as an integrated whole, as the Board is bound to do, the Board pulled one line from Section 4 of the Wage Article with one line from Section 5 of the Wage Article, and joined them with a clearly unintended interpretation of Appendix A.  The end

result is the invention of an entirely new "status quo" and an entirely new type of wage increase that is different for each nurse, and different in structure from any other wage increase that has ever been paid by the Hospital pursuant to the 2011 CBA, the 2009 CBA, or the 2005 CBA. For this reason, the Board's findings concerning the status quo and unilateral change are not supported by substantial evidence based upon the record as a whole, and therefore must be vacated by this Court.

### b.)    The Past Practice of the Parties

The parties' past practice concerning the payment of wage increases post-contract expiration supports the Hospital's assertion that it made no unilateral change and that rather, both parties were aware of and acquiesced to the post-expiration practice concerning payment of wage increases. This Court held in DuPont de Nemours & Co. v. N.L.R.B., that employers are entitled to raise arguments concerning past practice that immunize them from scrutiny under the Act, even where the collective bargaining agreement between the parties has expired. 682 F.3d 65 (D.C. Cir. 2012). Wage increases only become established past practice where "they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation of the employees, and therefore, part of their anticipated remuneration." Phelps Dodge Mining Co. v. N.L.R.B., 22 F.3d 1493, 1496 (10th Cir. 1994), quoting N.L.R.B. v.

31

<u>Nello Pistoresi & Son, Inc.</u>, 500 F.2d 399, 400 (9th Cir. 1974).  <u>See Also</u>, Member Hayes' dissent in <u>Finley Hospital</u>, 359 NLRB No. 9 (2012), *vacated*, 362 NLRB No. 102 (2015) ("The dynamic status quo line of cases was developed and applied in circumstances where unrepresented employees received wage or benefit increases *with such sustained frequency and regularity* that they regarded them as established terms of employment which an employer was obligated to continue when entering into a new collective-bargaining relationship.") (emphasis added). Furthermore, a number of Board decisions have found implied waivers where there has been a history of unilateral changes to terms and conditions by an employer without union objection.  <u>Mt. Clemons General Hospital</u>, 344 NLRB 450, 460 (2005).

The Board improperly ignored and dismissed evidence of past practice in the case at bar, and thus, the Board's findings were both inconsistent with the Board's own precedent, and unsupported by substantial evidence based upon the record as a whole.  The evidence contained in the underlying record illustrates that, by 2011, the Union, as an institution, and the Hospital shared the understanding that cessation of wage increases during a period of contract expiration under the parties' contract language was lawful, proven by the fact that the Union did not challenge the Hospital's non-payment of longevity-based wage increases in that year or demand to bargain with the Hospital concerning the payment of longevity-

based wage increases. Thus, the record proves that, by 2011, the parties had a shared understanding that longevity-based increases were not an established term or condition of employment for the covered employees in the setting of an expired contract.

The Union's acceptance of the Hospital's cessation of payment of wage increases in 2010 and 2011 likely resulted from the dismissal by the Board of an unfair labor practice filed by the Union over the Hospital's practice in 2010.  The Union appealed the dismissal of its charge, but the General Counsel's Office of Appeals denied the appeal.  In its Decision, the Board affirms ALJ Flynn's conclusion that the Board's dismissal of the Union's charge had "no precedential value," citing to Ball Corp., 322 NLRB 948, 951 (1997).   However, ALJ Flynn and the Board have missed the point, as they failed to consider the relevance of the General Counsel's dismissal in terms of how it defined the subsequent actions of the parties: As a direct result of the General Counsel's dismissal of the Union's charge, both parties understood that the Wage Article of the 2009 CBA did not obligate the Hospital to pay any wage increases to covered employees during a period of contract expiration.  Under this shared understanding, the parties then negotiated the 2011 CBA, each party knowing full well that neither party expected nor intended that wage increases included in the 2011 CBA, under Wage Article

language that was identical in every material aspect to the 2009 CBA [7], would be paid upon expiration.  Thus, even absent strict precedential value, the Board's dismissal and the resulting past practice and shared understanding, illustrated by both parties' actions, should have been considered by the Board in this case, as it would have resulted in a finding in favor of the Hospital.

The Board also adopted ALJ Flynn's finding that the Union's failure to challenge the Hospital's non-payment of a wage increase in 2011 was not evidence of established past practice.  However, ALJ Flynn's own reliance upon <u>Ball Corp.</u> belies this assertion.  Given that the 2010 dismissal had no precedential value, the Union knew full well that it had the right to re-file a charge based upon the Hospital's non-payment of wage increases in 2011.  Its failure to do so was therefore not inaction in the face of futility, as ALJ Flynn and the Board suggest, but rather willful and knowing acquiescence to a shared understanding of the status quo.

---

[7] Both CBAs include identical paragraphs upon which the General Counsel relied in alleging that longevity based increases were to be paid post-contract expiration. Moreover, the record establishes that the Wage Articles from the two CBAs were applied in an identical manner. (Tr. 254-56, JA 119-121)  Even the General Counsel and the Union agreed in their Answering Briefs to the Hospital's Exceptions that the Wage Articles of the 2009 CBA and 2011 CBA were similar, and had barely been modified between the two agreements (GC Answering Brief 3, JA 547; Union Answering Brief 3,4, JA 519, 520)  In fact, perhaps in recognition of the overwhelming evidence in the underlying record, the Board in its Decision explicitly declined to rely upon ALJ Flynn's assertion in her Decision that the Wage Articles of the 2009 CBA and 2011 CBA were "different."  (Decision FN 1, JA 573)

Accordingly, the Board had no reason to exclude this highly relevant information concerning past practice from consideration.  As a result of this exclusion, the Board's Decision is not supported by substantial evidence based upon the record as a whole and therefore must be vacated by this Court.  This Court should find that the substantial evidence presented to the Board obligated the Board to find no unilateral change occurred, or, at the very least, should remand the case to the Board so that it may properly consider the evidence on this point.

### 4.)    The Board's Application of the "Clear and Unmistakable Waiver" Standard is Improper

In addition to the reversible errors above, the Board erred when it applied the "clear and unmistakable waiver" standard, rather than the "contract coverage" standard, when analyzing the issue of the Union's waiver of its statutory right to the continuation of longevity-based increases post-contract expiration.  This Court has consistently found the Board errs when requiring an employer to establish clear and unmistakable intent by a union to relinquish a statutory right in situations like the one at bar.  In N.L.R.B. v. U.S. Postal Service, this Court rejected the Board's application of its clear and unmistakable waiver standard, commenting that, "it is naïve to assume that bargaining parties anticipate every hypothetical grievance and purport to address it in their contract.  Rather, a collective bargaining agreement establishes principles to govern a myriad of facts patterns." N.L.R.B. v. U.S. Postal Service, 8 F.3d 832 (D.C. Cir. 1993).  Similarly, in IBEW Local 47 v. N.L.R.B.,

this Court rejected the Board's reliance on the clear and unmistakable waiver doctrine, and instead noted that, when it comes to waiver of a statutory right, "the contract will control," further explaining that, "the union fully exercised its right to bargain over the retroactivity of the […] increase when it agreed to [the contract]. The company merely implemented the limitation that the parties had adopted when they signed the contract."  IBEW Local 47 v. N.L.R.B., 927 F.2d 635, 641 (D.C. Cir. 1991). Finally, in Enloe Medical Center v. N.L.R.B., this Court held, "The Board's [waiver] doctrine imposes an artificially high burden on an employer who claims its authority to engage in an activity is granted by a [collective bargaining agreement]."  433 F.3d 834, 837 (D.C. Cir. 2005). [8]

In the case at bar, the Board did everything in its power to avoid letting the contract control the Board's decision with regard to the Union's waiver.  This is most clearly indicated by the Board's finding that the Hospital had not violated the 2011 CBA when it stopped paying wage increases after the expiration of the 2011 CBA, but still somehow derived from the exact same contract language an ongoing statutory obligation to pay longevity-based increases.  If the language of Sections

---

[8] Other Circuits have shown similar disdain for the Board's application of the clear and unmistakable waiver doctrine. See, N.L.R.B. v. Solutia, Inc., 699 F.3d 50, 66 (1st Cir. 2012); Chicago Tribune Co. v. NLRB, 974 F.2d 933 (7th Cir. 1992)("[W]here the contract fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining, it is incorrect to say that the union has 'waived' its statutory right to bargain; rather, the contract will control and the 'clear and unmistakable' standard is irrelevant.")

1, 2, and 3 showed, as the Board held, no statutory obligation to continue annual wage increases, then the same language must logically support a finding that there was no statutory obligation to pay longevity-based increases. The Board's finding to the contrary is clear evidence of arbitrary decision-making by the agency, in violation of the Administrative Procedure Act. See, Cmty. Hospital of Cent. Cal.. N.L.R.B., 335 F.3d 1079, 1082-83 (D.C. Cir. 2003) (The Board will be overturned where the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.")

If this case had been properly analyzed under the "contract coverage" standard, the evidence would have compelled a finding by the Board that the Hospital lawfully discontinued longevity based increases, based upon the clear language of the 2011 CBA and the past practice of the parties, as explained above. For this reason, this Court should vacate the Board's Decision, or at the very least, remand the case to the Board so that it can apply the proper standard to its analysis of waiver.

### 5.)     The Board's Findings Regarding Waiver are Not Supported by the Record

Though the Hospital contends that the Board should have applied the "contract coverage" standard rather than the "clear and unmistakable waiver" standard when analyzing whether the Union had waived a statutory right to the payment of longevity-based increases post-contract expiration, even under the

Board's election of the "clear and unmistakable waiver" standard, the record includes compelling proof of clear and unmistakable waiver by the Union that was ignored by the Board.  The Board's finding that the Union did not waive any statutory right it may have had to the payment of longevity-based increases post-contract expiration is not supported by the Board's application of its own precedent or substantial evidence based upon review of the record as a whole.

Even when the Board applies the "clear and unmistakable waiver" standard, the Board is still required to consider a number of factors in determining whether a party has contractually waived their statutory entitlement to the continuation of a term or condition of employment, including contract language, the parties' past dealings, the relevant bargaining history, and other facts that may illuminate the parties' intent.  Litton Microwave Cooking Products Div., Litton Systems, Inc. v. NLRB, 868 F.2d 854, 858 (6th Cir. 1989).  See Also, The Courier Journal, 342 NLRB 1148 (2004), citing The Post Tribune Co., 337 NLRB at 1280.  Thus, it is clear that even the Board's "clear and unmistakable waiver" standard still requires the Board to analyze contract language and past practice when determining whether a waiver occurred.  On the question of what constitutes "clear and unmistakable" waiver, evidence as to whether a Union has filed a charge can, in some circumstances, be considered as evidence of whether the Union intended to waive its bargaining rights.  Intermountain Rural Elec. Ass'n v. N.L.R.B., 984 F.2d

1562, 1567 (10th Cir. 1993).  In the Board's now-void <u>Finley Hospital</u> decision, the Board's finding that there was no clear and unmistakable waiver by the Union was based in part on the parties' stipulation that there existed a ten-year-long past practice of paying nurses an annual 3% pay increase that did not vary from year-to-year.  <u>Finley Hospital</u>, 359 NLRB No. 9 (2012).

In the case at bar, the record establishes that the "clear and unmistakable waiver" standard was met, but the Decision is devoid of any such analysis.  The first factor the Board failed to consider was the relevant contract language.  ALJ Flynn and the Board found no contractual duty to pay the increases, so it is clear that the contractual language did not point to an ongoing statutory obligation.  The Board fails to address this point as part of its analysis on the question of "clear and unmistakable" waiver.  Furthermore, as explained previously, the parties' past dealings show that no payment of wage increases was made during periods where no effective CBA existed.  By 2011 the parties had, through their practice after the expiration of the 2009 CBA and their adoption of the clear language of the 2011 CBA, agreed that the status quo was the non-payment of wage increases after contract expiration.  This shared understanding is further indicated by way of the conclusory language of the Wage Article and Appendix A, both of which indicate that the wage increases prescribed therein were intended to last only as long as the 2011 CBA was effective.  The parties' bargaining history indicates a shared

understanding that the status quo was the non-payment of wage increases after contract expiration, but this information was not analyzed by the Board as part of its determination that the "clear and unmistakable" waiver standard was not met in this case. Finally, the fact that the parties began successor negotiations with proposals for wage increases to be paid in January 2014 is further evidence that signals the parties' intent that the wage increases set forth by the 2011 CBA would expire with the contract. Again, this evidence was not considered by the Board's narrow and improper analysis of "clear and unmistakable" waiver.

For all these reasons, it is clear that the Board did not carry out a proper analysis on the question of waiver, and that if it had, the Board would have concluded that the Union waived any statutory right it may have had to continued wage increases post-contract expiration. Therefore, this Court should vacate the Board's Decision and Order, or at the very least, remand the case to the Board so that it may properly apply its own analysis of "clear and unmistakable" waiver.

### 6.)     The Board's Approach is Contrary to Precedent and Obfuscates the Long-Held Principles of the Act

Assuming solely for the sake of argument that the Court does not vacate or remand the Board's Decision on any of the compelling grounds above, the Court must correct the Board's errant and unauthorized creation of new and wide-ranging authority in the case at bar.

### a.) The Board's Decision Departs from Precedent

For decades, in keeping with the Act, the objective of the Board's precedent on the subject of the parties' maintenance of the status quo post-contract expiration was focused on preventing an employer from *reducing* employee wages or benefits after contract expiration in order to gain advantage during future negotiations with the employees' collective bargaining representative toward a successor collective bargaining agreement.  See, Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, FN6 (1988), *citing* N.L.R.B. v. Katz, 369 U.S. 736 (1962) ("Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract."). In other words, the goal of the Board's status quo rule, as developed by the Board's own precedent, has always been to *preserve* the conditions of employment after contract expiration, in order to encourage the parties to bargain in good faith and prevent the employer from delaying implementation of a new, successor contract in order to enjoy a reduction or elimination of the payment of such benefits.  See, Id.

In keeping with this proper and legal understanding of the purpose and parameters of its status quo doctrine, the Board and the Courts long-held that additional raises or new benefits post-contract expiration are not a statutory right,

41

but rather, a matter for bargaining anew.  See Intermountain Rural Electric Assn. v. N.L.R.B., 984 F.2d 1562 (10th Cir. 1993).  Under this analysis, the Hospital would have had no obligation, post-expiration of the 2011 CBA, to grant employees additional longevity-based wage increases.  Rather, the Hospital had an obligation to continue to pay employees those wages and benefits to which they were entitled under the now-expired 2011 CBA.  There is no dispute in this case that, post-expiration of the 2011 CBA, the Hospital continued to pay covered employees those wages and benefits to which they had been entitled under the 2011 CBA and at no time reduced those wages or benefits.

However, in the case at bar, the Board has continued an alarming recent trend that departs without sound explanation or legal authority from years of precedent.  The result, as illustrated by this case, is a grotesque contortion of the Board's otherwise simple and straightforward status quo doctrine under which the Board holds that, in order to maintain the status quo post-contract expiration, an employer must continue with any changes that follow a "well-established process." See, Finley Hospital, 359 NLRB No. 9 (2012), vacated, 362 NLRB No. 102 (2015).  The Board's new approach is a dangerous and unauthorized expansion of the Board's authority that is not supported by common sense or the clear language of the Act.

First, the Board's new approach to the concept of the maintenance of the status quo defies common sense. Black's Law Dictionary defines "Status quo" as "the existing state of things at any given date." Black's Law Dictionary 1264 (5th ed. 1979). The term "status quo" means that things must stay the same – particularly, that terms and conditions of employment must stay the same after the contract expires as they were before the contract expired, until either a new contract or impasse is reached. There is no logical explanation for how a new increase to wages, whether it be longevity-based or otherwise, can be considered the "status quo" – the current state of affairs at the time of contract expiration. The resulting concept that an employer is obligated to make changes to existing practice in order to maintain the status quo is similarly fundamentally flawed. The maintenance of the status quo, by its facial definition, can never require an employer to carry out a new process that never occurred in the past. Yet this is precisely the result that the Board's Decision in this case requires.

Here, the Board's Decision requires the Hospital to pay a separate longevity-based increase to employees based upon a calculation that the Hospital has never used before, when the parties' past practice involved only the payment of longevity based increases calculated in conjunction with across-the-board increases, and on only those specific dates set forth by the terms of the 2011 CBA. The Board's creation of an entirely new pay practice, based upon an entirely new calculation,

43

created solely in the discretion of the Board, simply cannot be squared with the notion of the maintenance of the status quo, even under the Board's newly expanded definition.

### b.) The Board's Decision Contravenes the Purposes of the Act

Furthermore, and perhaps most importantly, the Board's Decision in the case at bar, is a radical and unlawful expansion of the Board's authority to interfere with collective bargaining between private parties, in contravention of the clear language of Section 8(d) of the Act, and the decades of precedent which interpret the Act. <u>See</u>, 29 U.S.C. § 158(d). Section 8(d) has been widely interpreted by both the Board and the Courts to hold that the Board is imbued with the authority to govern the *process* of collective bargaining between private parties, but that the Board is not to divine the *substance* of collective bargaining.  In <u>H.K. Porter v. N.L.R.B.</u>, 397 U.S. 99 (1970), the United States Supreme Court stated,

> "It is implicit in the entire structure of the Act that the Board acts to oversee and referee the process of collective bargaining, leaving the results of the contest to the bargaining strengths of the parties […] [T]he fundamental premise on which the Act is based [is] private bargaining under governmental supervision of the procedure alone, without any official compulsion over the terms of the contract." <u>Id.</u> at 180.

The Court made clear that under Section 8(d) of the Act, neither the Board nor reviewing Courts may compel specific agreements by the parties.  Rather, the Act

is premised on freedom of contract, and the Board is to oversee that process, while leaving the results of that process to the relative bargaining strength of the parties.

By its very nature, the Board's Decision in this case violates the edict set forth by the Supreme Court in H.K. Porter.  By divining on behalf of the parties, as though standing in their stead, which new terms and conditions of employment employees are entitled to post-contract expiration, the Board is directly imposing terms and conditions of employment for a successor agreement upon the parties in violation of H.K. Porter and the Act.   In the case at bar, for example, the Board's holding that the Hospital must pay longevity-based increases *ad infinitum* amounts to the Board divining a specific contract proposal on behalf of the parties, and forcing that proposal upon the parties – even in the face of proposals for a successor agreement that clearly established a new wage scale and new dates of wage increase payment.  The Board's remedy creates a new payment obligation, comprised of an entirely new wage increase calculation, and removes a condition precedent that clearly existed in the 2011 CBA – namely, satisfactory job performance - to payment of this new increase.  See GC Ex. 2, §§ 25.1-25.3, JA 269-270.  This is patently different than what the parties negotiated and practiced before the expiration of the 2011 CBA.

As a result of its imposition of terms and conditions of employment upon the parties, the Board's Decision creates an impermissible imbalance of power at the

negotiating table.  See Alwin Mfg. Co., Inc., 326 NLRB 646, 688-689 (1988) (The purpose of maintaining the status quo is to leave unchanged the position of the parties at the bargaining table.).  The Board's approach in this Decision allows the Board to set future terms and conditions of employment on behalf of the parties, thereby preventing the parties from bargaining in good faith for those terms and conditions of employment that are of value to each party.  This approach has global implications for labor relations nation-wide:  In future cases, unions may not engage in good faith bargaining, instead relying upon the Board to utilize its new approach to the status quo to impose upon the parties those terms and conditions that the union may or may not have otherwise achieved through collective bargaining.  Unions may very well determine that, under precedent such as that set by this case, they need not negotiate after reaching an initial collective bargaining agreement, since by the Board's logic, all terms and conditions will continue into the future by operation of the statute unless the continued application of the term is explicitly waived in the contract.  In this way, the Board's Decision creates a disincentive for any union to negotiate in good faith, where precedent would allow the union to obtain wage increases and other contract provisions in perpetuity after the expiration of the contract. [9]

---

[9] Similarly, the Board's rationale, as expressed in its Decision, would prevent employers from effectively engaging in "concession bargaining," which to date has always been considered lawful by the Board.  An employer who may want to

In a related vein, the precedent created by this case would serve to impede future collective bargaining between private parties, by affecting how the parties think about the contract terms that they enter into with one another.  For example, on the assumption that any limited-term wage increase contained in a collective bargaining agreement will be converted by the Board into a term and condition of employment which the employer will have the obligation to maintain well beyond the durational limits of the collective bargaining agreement - and perhaps into perpetuity – unless an explicit waiver is included in each and every section of the agreement, both employers and unions alike are likely to hesitate before agreeing to any such terms. The end result will be increasingly common declarations of impasse between the parties.  This outcome is precisely the opposite result of the aims of the Act, which are intended to foster good faith negotiations between the parties, and the creation of collective bargaining agreements.

This threat to the balance of the collective bargaining process, which the Act was specifically instituted to support and foster, is realized in the case at bar. Rather than respond to the Hospital's proposals concerning a Wage Article for the

---

propose regressive changes in terms and conditions in employment from those which existed in the expired agreement would be thwarted by the union's position that, under the instant case, any provision of the expired CBA is part and parcel of the status quo, and thus, cannot be reduced or discontinued unless the union explicitly agrees.  This renders the strategy of concession bargaining entirely ineffective for the employer, in a way that the Board has never limited the strategy before.

parties' successor collective bargaining agreement, as a result of the Board's intervention, the Union was able to fall back on the Board's Decision and refuse to agree to any change. Thus, the Board's remedy in this case rendered the Hospital's future proposals on the Wage Article moot. The parties' negotiations on the subject of 2014 wage increases were improperly and unlawfully undermined, and the Hospital's position at the bargaining table compromised, if not entirely thwarted, by the Board's intervention and imposition of specific future terms and conditions of employment upon the parties by way of its Decision in this case. [10]

Therefore, because the Board's Decision in this case constitutes both a logical fallacy and an unauthorized expansion of the Board's authority in violation of the Act and well-established Supreme Court precedent, the Board's approach in this case should be struck down by this Court. Instead the Court should apply the status quo doctrine to serve the purposes of the Act, and thereunder, find that the Hospital maintained the status quo as required by the Act in this case.

---

[10] In its underlying briefs presented to the Board, the General Counsel made much of the fact that the Hospital attempted, in negotiations held after the expiration of the 2011 CBA, to insulate itself from the Board's similarly overreaching decision in Finley Hospital. Perhaps the only noteworthy aspect of this fact is that the Union flatly rejected all of the Hospital's proposals on the subject (Tr. 135, JA 102), only further proving that the Board's Decision in this case created an incurable imbalance between the parties in future collective bargaining, and imbued the Union with the ability to reject wholesale the Hospital's proposals without counter, all the while relying upon the Board's improper intervention to grant employees ongoing benefits for which the Union had not bargained.

## <u>CONCLUSION</u>

For all these reasons, the Hospital respectfully requests that this Court deny enforcement of the Decision.

Respectfully submitted,

/s/ Kaitlin A. Kaseta
KAITLIN A. KASETA, ESQ.
CARMODY & CARMODY LLP
73 Bogard Street
Charleston, South Carolina  29403
(860) 307-3223
kaitlinkaseta@gmail.com

/s/ Bryan T. Carmody
BRYAN T. CARMODY, Esq.
Carmody & Carmody, LLP
134 Evergreen Lane
Glastonbury, Connecticut  06033
(203) 249-9287
bryancarmody@bellsouth.net

*Counsel for Petitioner/Cross-Respondent*

Dated:        September 13, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>11,833</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally-spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u> font.


Dated: September 13, 2016        /s/ Kaitlin A. Kaseta
                                 KAITLIN A. KASETA, ESQ.

                                 /s/ Bryan T. Carmody
                                 BRYAN T. CARMODY, Esq.

                                 *Counsel for Petitioner/Cross-Respondent*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 13th day of September 2016, I caused this Opening Brief, to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Kaitlin A. Kaseta
KAITLIN A. KASETA, ESQ.

/s/ Bryan T. Carmody
BRYAN T. CARMODY, Esq.

*Counsel for Petitioner/Cross-Respondent*